## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANKLIN UNIVERSITY, : | |
| 201 S. Grant Avenue : | |
| Columbus, Ohio 43215 : | |
| : | |
| Plaintiff, : | Civil Action No.: 2:21-CV-1304 |
| : | |
| vs. : | Judge: |
| : | |
| CGFNS INTERNATIONAL, INC., : | Magistrate Judge: |
| 3600 Market Street : | |
| Suite 400 : | |
| Philadelphia, PA 19104 : | |
| : | |
| Defendant. : | |

## **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

For its Verified Complaint against Defendant Commission on Graduates of Foreign Nursing Schools (CGFNS), Franklin University alleges and states as follows:

## **NATURE OF THE ACTION**

1. This lawsuit involves the process by which nurses from other countries become certified to practice nursing in the United States.

2. Through statutes and regulations, the federal government has stated that nurses from other countries who meet the statutory and regulatory criteria must be certified to practice in the United States, in large part to alleviate a critical shortage of skilled nursing care.

3. CGFNS is supposed to certify those nurses.

4. According to the relevant statutes and regulations, the nurses at issue in this lawsuit are qualified to work in the United States, and under federal law, CGFNS must certify them to do so.

5. Without any authority, and without legitimate evidence that such action is necessary, proper, or even legal, CGFNS has usurped Congressional authority over the qualification of nurses from other countries practicing in the United States.

6. Specifically, CGFNS is preparing to institute a new rule starting on April 1, 2021—without any authority to do so—pursuant to which CGFNS will refuse to certify that nurses from other countries are qualified to practice in the United States, even though those nurses meet all requirements for certification set forth in the United States Code and the Code of Federal Regulations.

7. In short, Congress has said the nurses at issue must be certified to practice in the United States; CGFNS says it knows better.

8. The result is that CGFNS is exacerbating the very nursing shortage that Congress has tried over the years to alleviate.

9. CGFNS is not a branch of the federal government; it is not a federal agency.

10. As a nonprofit organization, CGFNS has no authority to alter or ignore laws enacted by Congress and regulations promulgated by the federal government. If a foreign nursing student meets the federal legal requirements, CGFNS must certify that individual.

11. CGFNS' continued willingness to flout federal law and regulations, and substitute its own opinions for statutory and regulatory commands established by Congress, harms not only Franklin University and its nursing students, but also health providers in the United States and, most critically, patients who need the care provided by the Franklin Nursing students who now cannot get jobs because of CGFNS' unlawful actions.

## THE PARTIES

12. Franklin is one of Ohio's largest private universities, educating approximately 9,000 students per year in Columbus, Ohio and at its co-locations (including online). Franklin is

fully accredited by the Higher Learning Commission and by the Ohio Department of Education and holds specialized accreditation from the relevant authorities in nursing, health informatics, teacher education, business, and other disciplines.

13. Franklin is an Ohio nonprofit corporation with its principal place of business in Columbus, Ohio.

14. Since 1902, Franklin's student body has been composed largely of busy adult students who seek to earn a college degree conveniently and affordably, while keeping up with the demands and responsibilities of work and family.

15. Among the many other services the University offers, Franklin gives international students access to a high-quality U.S. education, in collaboration with select global partners.

16. At its main campus in Columbus, Ohio, and at campuses located throughout the Midwest, Franklin offers multiple accredited programs at the undergraduate, master, and doctoral levels. Relevant to this lawsuit, Franklin offers an online bachelor of science in nursing, RN-BSN Program ("the Program"). The Program is part of Franklin's broader nursing curriculum, which also includes its CCNE-accredited Master's in Nursing Program with Family Nurse Practitioner specialty, and Doctorate in Nursing Practice.

17. Defendant is the Commission on Graduates of Foreign Nursing Schools, a Pennsylvania nonprofit corporation with its principal place of business located at 3600 Market Street, Suite 400, Philadelphia, Pennsylvania.

18. CGFNS plays a limited role in the process of certifying nurses from other countries who wish to practice in the United States. Specifically, nurses from overseas who wish to enter and work in the United States may do so only by obtaining from CGFNS a document certifying

that the nurse applicant meets the immigration requirements for working as a nurse in the United States.

19. CGFNS is currently the only organization approved by the federal government to issue these certification documents to nursing candidates from other countries who wish to practice in the United States.

## JURISDICTION & VENUE

20. The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, because CGFNS has acted contrary to the laws of the United States.

21. The Court also has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, because it involves citizens of different states and there is more than $75,000 in controversy, exclusive of interest and costs.

22. The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 2201(a) to declare the rights and other legal relations of the parties to this action.

23. This Court has the authority to issue declaratory relief pursuant to Rule 57 of the Federal Rules of Civil Procedure.

24. This Court has the authority to issue the requested injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

25. The Court has personal jurisdiction over CGFNS because CGFNS has its principal place of business in this judicial district.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims for relief occurred in this judicial district.

## RELEVANT FACTS

**CONGRESS PASSED THE NURSING ACT TO ALLEVIATE THE CRITICAL SHORTAGE OF SKILLED NURSING CARE IN THE UNITED STATES.**

27. Historically, there has been a critical shortage of skilled nursing care in the United States. Specifically, rural and poor communities in the United States struggle to attract and retain skilled, domestic nurses to work in their areas.

28. In 1999, Congress passed the Nursing Relief for Disadvantaged Areas Act (the "Nursing Act") to help poor and rural communities attract and retain nurses from overseas who are willing to come to the United States and work in healthcare facilities in those communities. In the Nursing Act, Congress specifically and purposefully amended various U.S. immigration laws to attract nurses from other countries to the United States.

**CONGRESS SET FORTH THE QUALIFICATIONS NECESSARY FOR NURSES FROM OTHER COUNTRIES TO PRACTICE IN THE UNITED STATES.**

29. In the Immigration and Nationality Act (the "INA" or the "Act"), Congress set forth the specific qualifications that nurses from other countries must meet in order to qualify to practice in the United States and help alleviate the country's nursing shortage.

30. The starting point is 8 U.S.C. § 1182(a)(5)(C), which states that individuals from other countries who seek entry to the U.S. to perform health care work are inadmissible unless they meet certain statutory criteria.

31. But the INA also provided a way for an individual from another country to gain admission to work as a nurse in the U.S.: by presenting a *certificate* from CGFNS, after demonstrating compliance with subsection (a)(5)(C) of the INA.

32. To obtain a certificate, the applicant's education, training, license, and experience (a) must meet all statutory and regulatory requirements for entry into the U.S., (b) must be

comparable with similarly situated American health care workers, and (c) must be legitimate and unencumbered. 8 U.S.C. § 1182(a)(5)(C)(i).

33.     In addition, a nurse from another country must demonstrate English proficiency, as shown by an "appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write." 8 U.S.C. § 1182(a)(5)(C)(ii).

34.     If a majority of states licensing nurses recognizes a test predicting success on the profession's licensing or certification exam, the applicant must also pass that test. 8 U.S.C. § 1182(a)(5)(C)(iii).

**CONGRESS AMENDED THE INA TO PROVIDE ANOTHER OPTION FOR NURSES FROM OTHER COUNTRIES TO WORK IN THE UNITED STATES.**

35.     To alleviate the country's nursing shortage, Congress in 1999 amended the INA by adding subsection (r) to § 1182 and clarifying that subsection (a)(5)(C) was now "subject to subsection (r)." 8 U.S.C. § 1182(r) is titled, "Exception for Certain Alien Nurses."

36.     The new subsection (r) of § 1182 provided a new way for nurses from other countries to work in the United States: by obtaining from CGFNS a *certified statement*.

37.     The certified statement under 8 U.S.C. § 1182(r) is different from the certification under subsection (a)(5)(C).

38.     Under 8 U.S.C. § 1182(r), the certified statement must attest that:

(1) the alien has a valid and unrestricted license as a nurse in a State where the alien intends to be employed and such State verifies that the foreign licenses of alien nurses are authentic and unencumbered;

(2) the alien has passed the National Council Licensure Examination (NCLEX);

(3) the alien is a graduate of a nursing program—

   (A) in which the language of instruction was English;

6

  (B) located in a country—

    (i) designated by such commission not later than 30 days after November 12, 1999, based on such commission's assessment that the quality of nursing education in that country, and the English language proficiency of those who complete such programs in that country, justify the country's designation; **or**

    (ii) designated on the basis of such an assessment by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection; **and**

  (C)

    (i) which was in operation on or before November 12, 1999; **or**

    (ii) has been approved by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection.

(8 U.S.C. § 1182(r)) (emphasis added).

  39. Notably for this lawsuit, subsection 1182(r) does not contain subsection (a)(5)(C)'s requirement that the applicant demonstrate English proficiency by achieving an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write.

  40. Instead, Congress replaced the testing requirement with a requirement that the applicant be a graduate of a nursing program, "in which the language of instruction was English."

  41. Read together, the statute and the regulation that implements it also require that the nursing program—not the nurse—be located in one of seven English-speaking countries,

"Australia, Canada (except Quebec)[1], Ireland, New Zealand, South Africa, the United Kingdom or the United States." 8 C.F.R. § 212.15(g).

42.     Significantly, when creating § 1182(r) of the INA, the Nursing Act ordered CGFNS to issue certified statements to applicants who satisfy the criteria of § 1182(r). Specifically, the Nursing Act said:

> ISSUANCE OF CERTIFIED STATEMENTS.—The Commission on Graduates of Foreign Nursing Schools, or any approved equivalent independent credentialing organization, **shall issue** certified statements pursuant to the amendment under subsection (a) [8 U.S.C. § 1182(r)] not more than 35 days after the receipt of a complete application for such a statement.

(Public Law No: 106-95, § 4(c), 11/12/1999) (Emphasis added).

43.     The point of the statutory amendment is simple: nurses from other countries do not have to demonstrate their proficiency in English through a test, because they have graduated from a nursing program taught in English and located in one of seven English-speaking countries.

44.     Furthermore, after the students graduate from Franklin's Program, employers evaluate their English proficiency as part of the hiring process. No employer has ever expressed to Franklin a concern about the English proficiency of its nursing graduates.

**FRANKLIN'S NURSING PROGRAM EDUCATES AND TRAINS NURSES FROM OTHER COUNTRIES TO WORK IN THE UNITED STATES.**

45.     Franklin University plays a key role in remedying the country's shortage of nurses by offering an online baccalaureate degree program in nursing.

46.     Franklin educates nurses from other countries. Franklin's program is attractive to nurses from other countries because they can receive an excellent education from an American university without incurring costs associated with moving to the United States until they have

---

[1] Presumably, Quebec is exempt because the predominant language is French and thus does not guarantee that the language of instruction in its nursing programs is English.

8

secured employment. After they earn their RN-BSN from Franklin—and provided they meet applicable immigration requirements—those nurses come to the United States to work, which helps alleviate the country's critical nursing shortage.

47. Franklin's RN-BSN Program began in 1982. The Program is accredited by the Commission on Collegiate Nursing Education's (CCNE) Board of Commissioners. Franklin has worked hard over the years to obtain and maintain this accreditation.

48. The Program is designed to build on the existing education and training of overseas nurses, specifically for registered nurses with an Associate's Degree or nursing diploma, so that candidates can earn a Bachelor's of Science in Nursing (BSN) degree.

49. To get into Franklin's RN-BSN Program, nurses from other countries must achieve an acceptable score on a proctored standardized test of their proficiency in English.

50. The Program consists of nine online courses, each offered over a six-week period. It takes approximately one year for a student to complete the Program.

51. Franklin's Program is located in the United States. All instruction happens from the United States, although Franklin acknowledges that its students are located overseas. Importantly, the relevant federal law does not say that students must live in the country where the school is located in order to be a student of that school. The statute mandates the location of the school that provides the instruction, not the location of the student.

52. The sole language of instruction for the Program is English. The Program is taught by U.S. faculty and the textbooks used in the Program are entirely in English.

53. Graduates of Franklin's Program meet all of the criteria of § 1182(r) to receive certified statements from CGFNS: they hold a valid and unrestricted nursing license in the State of New York or the State of California (the States in which they received job offers and the States

in which they became employed); they passed the National Council Licensure Examination for Registered Nurses ("NCLEX-RN") exam; and they graduated from a nursing program (Franklin's Program) in which the language of instruction and textbook was English and which is located in the United States.

**CGFNS' ROLE IN CERTIFICATION OF NURSES FROM OTHER COUNTRIES.**

54. CGFNS has a narrowly-circumscribed and well-defined role in the process of credentialing nurses from other countries for entry into, and practice in, the United States.

55. CGFNS is not a federal legislative body or agency; it is a non-profit entity.

56. CGFNS has no authority to introduce, debate, pass, or enact federal law.

57. CGFNS has no authority to introduce, debate, pass, or enact federal regulations.

58. CGFNS' role is limited to reviewing applications from overseas nurses, determining whether they meet the immigration requirements established by Congress in the INA, and granting certificates (under subsection (a)) or certified statements (under subsection (r)) to qualifying applicants. That is it; that's CGFNS' role. Notwithstanding this limited role, CGFNS has taken it upon itself to impose on Franklin's RN-BSN graduates a requirement not found in the relevant federal law. Specifically, CGFNS has said that graduates of Franklin's Program will now have to demonstrate English proficiency in a way that Congress has specifically said they do not have to demonstrate it.

59. CGFNS is currently the only credentialing organization authorized to grant certificates and certified statements to nurses from other countries who wish to enter and work in the United States.

60. The first "Cohort" (i.e., matriculating class of students) in Franklin's Program began classes at Franklin in March of 2015.

61.     Even before the first Cohort began their classes, Dr. Catherine Davis was Director of Global Learning, Research and Development at CGFNS. In 2014, as Franklin prepared to open its Program, Dr. Davis wrote to Dr. Gail Baumlein at Franklin University to confirm that, "Graduates from these programs are exempt from the educational comparability review and from English language testing."

62.     Since that very first Cohort, CGFNS has deemed graduates of the Program to be eligible for the subsection 1182(r) exemption, and thus exempt from the standardized English test score requirements in subsection (a). In all, 167 students in Cohorts 1 through 10 have completed their coursework and graduated from the Program.

63.     CGFNS found that all 167 of those graduates of the Program were exempt from the English language proficiency requirement of the INA, pursuant to § 1182(r).

64.     In short, ll 167 of those graduates met all of the necessary requirements and criteria, received certified statements from CGFNS for admission into the United States, and went on to work as nurses in the United States.

65.     On August 10, 2017, CGFNS' Director of Credential Evaluation Services sent a letter to graduates of Franklin's Program from that year. In that letter, Jasper L. Tolarba at CGFNS informed the students, "[I]t was determined that graduates from your school, Franklin University (OH), are EXEMPT from the English Language Proficiency (ELP) requirement." (emphasis in original).

66.     Consistent with its limited role in the process, and its repeated statements to Franklin and its students, CGFNS has to date issued certified statements under 8 U.S.C. § 1182(r) of the INA to more than 150 graduates of Franklin's Program. .

11

67. Since Franklin's Program began in 2015, Congress has not changed the relevant immigration laws—Subsections 1182(a) and (r) have remained the same.

**CGFNS' UNLAWFUL AND IMPROPER VIOLATION OF FEDERAL LAW.**

68. Notwithstanding the fact that it granted certified statements to all 167 graduates of Franklin's Program, and without any change in the federal law, CGFNS has now announced that, starting April 1, 2021, it will require nurses from overseas in Franklin's Program to meet an English language proficiency requirement not found in the statute or its implementing regulation.

69. CGFNS has informed Franklin that it will institute a new policy starting April 1, 2021, on its own initiative and without legal authority, to withhold certified statements from nurses from overseas who meet all of the requirements of § 1182(r), unless those nurses demonstrate the very kind of English language proficiency that Congress specifically said is not required if the candidates meet the requirements of subsection 1182(r).

70. Specifically, CGFNS has stated that it will require Franklin's Program graduates to achieve a passing score on one of three standardized English language tests before it grants those graduates a certified statement, unless the student's "entry-level nursing education" was completed in an English-speaking country designated by CGFNS.

71. There is no basis in the relevant statutes or regulations for CGFNS' new requirements.

72. CGFNS' actions are contrary to federal law.

73. CGFNS' actions are arbitrary and capricious, and will prevent nursing graduates of the Program from entering the United States to work as skilled nurses, thereby exacerbating the very nursing shortage that the Nursing Act was designed to alleviate.

74. CGFNS' policy has not gone through the legislative process of bicameralism and presentment, and therefore is not binding law.

75. Congress, not CGFNS, controls immigration law in the United States.

76. CGFNS' abuse of the power granted to it by Congress is particularly acute because CGFNS is the only organization currently authorized by the federal government to certify nurses from other countries. Congress asked CGFNS to perform an administrative function: reviewing the qualifications of nurses from other countries to ensure compliance with the statutory and regulatory requirements. CGFNS has appointed itself an arm of the federal government, with powers to legislate and make rules equivalent to Congress and executive agencies.

77. When CGFNS first announced its unilateral and unlawful rule change, Franklin sued CGFNS in federal district court in Columbus, Ohio. S.D. Ohio Case No. 2:20-cv-05271.

78. After CGFNS agreed to delay the rule change, Franklin voluntarily dismissed the case without prejudice on November 12, 2020.

79. During limited discovery in the Columbus case, however, CGFNS could not produce any legitimate evidence that Franklin's graduates lack proficiency in English.

80. CGFNS produced no complaints from hospitals, clinics or nursing homes that employ Franklin graduates.

81. CGFNS produced no complaints from doctors who work with Franklin graduates.

82. CGFNS produced no complaints from patients cared for by Franklin graduates.

83. CGFNS produced no complaints from state regulatory bodies.

84. The sole "complaint" CGFNS produced about the English proficiency of Franklin's graduates was from the owner of a staffing company that secures employment for nurses from programs of Franklin's competitors.

85. Even if CGFNS had the authority to institute the contemplated rule change, it has no evidence to support the need for such a change.

**HARM TO FRANKLIN UNIVERSITY AND THE NEED FOR INJUNCTIVE RELIEF.**

86. CGFNS' unlawful actions have harmed—and will continue to harm—not only students and graduates of Franklin's Program, but also Franklin itself.

87. CGFNS' policy restricts Franklin to recruiting students who complete their "entry-level" nursing education in one of the seven exempt English-speaking countries, as designated by CGFNS. Because the Program relies heavily on enrollment from international students outside of these countries (specifically South Korea), CGFNS' action will cause a precipitous drop in enrollment, which threatens the very existence of Franklin's Program and will force Franklin to suspend or terminate the Program. The decrease in—or complete absence of—enrollment in Franklin's RN-BSN Program will also negatively impact Franklin's new nursing doctorate program, designed to attract students directly from the RN-BSN Program.

88. Although there are American students enrolled in Franklin's Program, the vast majority of students in the Program are from South Korea.

89. In a typical year, Franklin has 15-20 RN-BSN students from South Korea, though in certain years it has had as many as 25-30 students from South Korea.

90. Tuition for the program is $15,000.00.

91. Part of what the Program's South Korean students find appealing about Franklin's Program is the ability to avail themselves of the statutory exemption found in subsection 1182(r).

92. Prospective students have told officials at Franklin and its recruiting partner in South Korea that if the CGFNS rule change takes effect, they will not enroll in the program.

93. Current students have told officials at Franklin that if the CGFNS rule change takes effect, they will leave the program and ask for a refund.

94. Franklin's liaison in South Korea who helps recruit nursing students to the Program has told the University that the rule change has effectively put an end to any students wanting to enroll in Franklin's BSN in the future.

95. Franklin's partner in the United States who helps to place RN-BSN students with permanent employers has told Franklin the same.

96. Even while the rule change has been pending, the potential change has harmed Franklin's reputation. Students have expressed frustration with Franklin, and a lack of interest in pursuing education there, given that students would no longer be able to avail themselves of the exemption in subsection 1182(r).

97. South Korean students and potential students have made it clear to Franklin that if the CGFNS rule change takes effect, they will no longer enroll in the program. Without the South Korean students in the Cohort, the existing Program is not financially viable.

98. If the rule change takes effect, Franklin cannot sustain the current RN-BSN program.

99. Without an active RN-BSN Program, Franklin will lose accreditation for the Program, and the Commission on Collegiate Nursing Education (CCNE) will notify all of its members that Franklin's Program is no longer accredited, causing further reputational damage to Franklin among its peer organizations, potential students, and the public.

100. Franklin has also invested significant staff and faculty time and energy in the past two years to create a Doctorate of Nursing Practice (DNP) program, in which students with a BSN can earn a Doctor of Nursing Practice degree by completing 1,000 post-baccalaureate practicum hours.

101.     A significant reason why Franklin developed a DNP program was to be able to educate nurses all the way from undergraduate level from the RN-BSN to a doctorate. Without an RN-BSN program, Franklin will not be able to provide a complete education to nursing students all the way from a bachelor's to a doctorate, further damaging its reputation in the higher education community, as well as among potential nursing students.

102.     This action seeks a declaration that CGFNS is acting contrary to law by promulgating its own policies that contradict existing federal immigration laws. Under its new policy, CGFNS will no longer issue "certified statements" to graduates of Franklin's Program, even though the graduates satisfy all of the immigration requirements of § 1182(r) of the INA to receive certified statements from CGFNS, and the Nursing Act requires CGFNS to issue those certified statements.

103.     Franklin further seeks a declaration that CGFNS' action of imposing an English language proficiency requirement upon nurses graduating from, and currently enrolled in, the Program is contrary to law because federal law already provides a specific exemption for graduates of the Program from the Act's English language proficiency requirement—namely, § 1182(r).

104.     An actual and substantial controversy exists between the parties as to whether CGFNS' actions imposing criteria different from those imposed by federal law, and which serve to deny graduates of Franklin's Program a certified statement to enable them to enter the United States to work as licensed nurses, are contrary to law.

105.     An actual and substantial controversy exists between the parties as to whether CGFNS' refusal to issue a certified statement to graduates of the Program is arbitrary, capricious, an abuse of discretion, discriminatory, and contrary to law.

106. Franklin seeks interim, preliminary, and permanent injunctive relief, preventing CGFNS from imposing unlawful criteria upon recent graduates of Franklin's Program and/or retroactively rescinding prior certified statements issued to graduates of Franklin's Program.

107. An actual and substantial controversy exists between Franklin, on the one hand, and CGFNS on the other, with respect to their rights and other legal relations because of CGFNS' statement and policy that it will no longer comply with its legal obligation to issue certified statements to graduates of Franklin's online RN-BSN Nursing Program.

108. CGFNS' actions are arbitrary and capricious and will prevent nursing graduates of the Program—who are otherwise qualified by education, training, license and experience—from entering the United States to work as skilled, registered nurses.

109. Although Franklin would much prefer injunctive relief in this case, so that its RN-BSN Program can continue uninterrupted, it also recognizes that if it is not successful at obtaining injunctive relief, it will suffer substantial financial losses due to CGFNS's actions. As a result, Franklin is seeking money damages in the alternative, because its RN-BSN Program will be eviscerated if CGFNS' rule change takes effect.

## COUNT I

### (Declaratory and Injunctive Relief)

110. Franklin incorporates by reference, as if fully rewritten herein, each allegation contained in the preceding paragraphs of this Complaint.

111. An actual and substantial controversy currently exists between the parties relating to CGFNS' adoption and application of its own criteria, in place of and contradictory to federal law, namely the Nursing Act and INA.

17

112. Declaratory relief will clarify the legal relations of the parties and will settle the parties' controversy at issue in this lawsuit.

113. This action does not raise any significant concerns between federal and state courts.

114. There is no preferable, alternative remedy that is better or more effective for settling the parties' controversy at issue in this lawsuit than declaratory relief.

115. Declaratory relief will terminate the uncertainty, insecurity, and controversy giving rise to this proceeding.

116. As a direct and proximate result of CGFNS' actions described herein, Franklin has been harmed, and is entitled to the declaratory relief requested in this Complaint.

117. As a direct and proximate result of CGFNS' actions described herein, Franklin has been harmed and will continue to be harmed, and is entitled to the requested injunctive relief.

118. In the alternative, as a direct and proximate result of CGFNS' actions described herein, Franklin will suffer a loss of enrollment in its RN-BSN program, and a corresponding loss of tuition revenue.

**WHEREFORE,** Plaintiff Franklin University demands that this Court enter judgment in its favor and against Defendant CGFNS International, Inc., as follows:

(i) Declaratory relief providing that:
   a. CGFNS' refusal to issue "certified statements" to graduates who: (i) receive their RN-BSN degree from Franklin's Bachelor of Science in Nursing Program; (ii) seek to enter the United States to perform labor as nurses; and, (iii) satisfy each of the requirements of § 1182(r) of the Immigration and Nationality Act, is contrary to existing and controlling federal law;
   b. CGFNS erred as a matter of law by imposing requirements to issue certified statements that are contrary to those required by existing federal law;
   c. CGFNS' "English Proficiency Requirements" are contrary to law and illegally, arbitrarily, and discriminatorily prevent graduates of Franklin's Program, qualified by education, training, license and experience, from entering the United States to work as nurses; and

      d. CGFNS' "English Proficiency Requirements" constitute an arbitrary and capricious abuse of discretion by CGFNS, which are not in accordance with existing federal law.

(ii) Temporary, preliminary, and permanent injunctive relief, prohibiting CGFNS from acting contrary to law by refusing to issue a certified statement under the Nursing Act and 8 U.S.C. §1182(r) to the students of Franklin's Program, on the grounds that they are not exempt from the English language requirements of the Act;

(iii) In the alternative, an award of money damages to compensate Franklin for its losses caused by CGFNS's actions, in an amount to be proven at trial, but in no event less than $675,000.00;

(iv) An award of Franklin its attorney's fees and costs incurred in the prosecution of this action; and,

(v) Such other and further relief as this Court deems just and equitable under the circumstances.

    Respectfully submitted,

    */s/ Jason H. Beehler*
    Jason H. Beehler   (PA #00328658)
    KEGLER, BROWN, HILL + RITTER, LPA
    65 East State Street, Suite 1800
    Columbus, Ohio  43215
    Telephone:  (614) 462-5400
    Facsimile: (614) 464-2634
    Email: jbeehler@keglerbrown.com

    *Attorneys for Plaintiff Franklin University*

State of Ohio            )
                         )  ss.
County of Franklin       )

## VERIFICATION

Being first duly sworn, the undersigned hereby declares that:

(1) he has reviewed the Verified Complaint,

(2) for the allegations that he has personal knowledge of, those allegations are true and accurate to the best of his knowledge, information, and belief; and

(3) for the allegations he does not have personal knowledge of, those allegations are true and accurate to the best of his knowledge, information, and belief, based upon specified information, documents, or both.

_____
By: David R. Decker, Ph.D.

Sworn to (or affirmed) before me and signed in my presence on this __16__ day of March, 2021.

_____
Notary Public

FRANK YANCHAK
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
01-06-2022